SILVA et al. v. BANKERS COMMER-
CIAL CORPORATION.
No. 235, Docket 20546.

Circuit Court of Appeals, Second Circuit.
July 30, 1947.

Kirlin, Campbell, Hickox & Keating, of New York City (Charles R. Hickox and Ruth M. McElveney, both of New York City, of counsel), for defendant-appellant.

S. F. Peavy, Jr., of New York City (John J. Cunneen, of New York City, of counsel), for plaintiffs-appellees.

Before SWAN, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiffs, DaCosta E Silva and Diaz, doing business as co-partners under the firm name of Silva & Diaz, were awarded a judgment in the court below of $7,836.75 with interest thereon from June 24, 1943 against defendant Bankers Commercial Corporation, together with costs as taxed. The court found that pursuant to an agreement of December 4, 1942, Intercontinental Steamship Lines, Inc. had executed an assignment to defendant of all earnings, freight and income of the schooner Constellation, and had also executed a preferred ship mortgage on that vessel in consideration of loans made by the defendant. The District Court made the following additional findings of fact:

"Sixth: That during the month of January, 1943, at about the 15th and 25th days thereof, plaintiffs delivered certain merchandise to and which was put aboard the Schooner Constellation in the Port of New York for shipment to South Africa, which merchandise remained aboard said Schooner Constellation until on or about the 15th day of February 1943.

"Seventh: That upon delivery by plaintiffs of the merchandise aforesaid on board said Schooner Constellation, proper bills of lading were issued to plaintiffs covering said merchandise by the Intercontinental Steamship Lines, Inc., a corporation, which was the owner of said Schooner, which bills of lading were delivered to plaintiffs by the defendant.

"Eighth: That on the 15th day of January, 1943, and the 4th day of February 1943, plaintiffs paid the sums of $7,825.50 and $11.25 respectively by cheques on account of freight for said merchandise, placed aboard the Schooner Constellation, for transportation of said merchandise to South Africa and that said cheques were delivered to Caragol-Clark Co. Inc. who endorsed and immediately delivered them to and were collected by and appropriated by defendant and deposited in its general account and kept by it, defendant well knowing that said payments were on account of the freight aforesaid and on delivery of said cheques, proper bills of lading therefor were delivered by defendant to plaintiffs.

"Ninth: That at sometime between the 11th day of February and the end of February 1943, said merchandise of the plaintiffs was removed from the Schooner Constellation without the knowledge or consent of plaintiffs; and without the knowledge or consent of plaintiffs, the voyage of the Schooner Constellation to South Africa was abandoned at sometime prior to the 26th day of April, 1943 and that thereafter during the months of May or June, 1943, said merchandise so taken off the Schooner Constellation was returned to the plaintiffs.

"Tenth: That on the 24th day of June, 1943, plaintiffs demanded payment from Intercontinental Steamship Lines, Inc., and from this defendant of the monies so paid for freight and were told by this defendant that such freight monies would be repaid to it and plaintiffs agreed to accept notes of Intercontinental Steamship Lines, Inc., for $2,621.63, $2,621.62 and $2,621.62 payable respectively July 5th, July 15th and July 26th, 1943, and defendant thereupon assured plaintiffs that said notes would be paid; but the said notes were not paid, but

were dishonored and returned by plaintiffs to the maker thereof.

"Eleventh: That defendant failed and refused to pay the plaintiffs the monies so paid by plaintiffs for freight and neither said freight monies nor any part thereof so had and received by defendant from plaintiffs have been paid or returned to plaintiffs.

"Twelfth: That on April 15th, 1943, the defendant still had on hand out of the funds realized from the freight monies collected by it, for freights on the Schooner Constellation more than $21,000.

"Thirteenth: That on or about April 15, 1943, Intercontinental Steamship Lines, Inc., requested an advance of further monies from the defendant herein in the sum of $20,000 in response to which request, defendant then or shortly thereafter advanced the sum of $10,000 but the defendant received new consideration for such advances, to wit, an agreement to reimburse defendant for legal expenses, an assignment of right, title and interest in a protecting and indemnity policy and also an assignment of all the Intercontinental Steamship Lines' right, title and interest in and to an insurance claim on the Schooner Theoline, in which the defendant then had an interest of $28,000 plus interest, but that the other $10,000 of the advance requested by Intercontinental Steamship Lines, Inc., by letter of April 15th, 1943, was not advanced by the defendant until on or about July 17th, 1943."

Judge Symes, before whom the case was tried without a jury, decided that "when the defendant accepted * * * freight money through their agent at the office of the freight agent of the ship, they were charged with knowledge of the purpose for which it was paid and also with the rule of law * * * to the effect that if the freight movement is not completed the freight money should go back to the consignor." He further said that the decision "was based on equitable principles; that is, that the plaintiffs paid money which the defendant took with full knowledge that it was freight money; that the consideration for which it was paid was not re-ceived by the plaintiffs, that is, the freight money was never earned; that the defendant, the Bankers, really got this money as managers of the Schooner Constellation; that they really managed the affairs of the Intercontinental; and that therefore on equitable principles and good conscience and justice they should pay it back for the reason that they took it with full knowledge of all the rights of the plaintiffs thereto."

In the first place, it is argued on behalf of the defendant that the issues involved in the present suit are maritime and are governed by the the rules of admiralty. We do not agree. The plaintiffs' claim is based on the assumption that the maritime contract upon which the freight moneys were paid was rescinded and that the defendant ought in equity and good conscience to return to them an equivalent amount with interest because it received the freight moneys knowing that they were paid for a voyage that was abandoned by the Intercontinental Steamship Lines with the consent and assistance of the defendant. The plaintiffs' claim is not simply one for breach of a maritime contract but for unjust enrichment by deliberate retention of credits received from Intercontinental that had been destined to pay for a voyage that was completely abandoned with the defendant's acquiescence and aid. The Constellation returned to the plaintiffs the cargo that she had taken on board, for which she had issued bills of lading; abandoned her original voyage to South Africa and undertook an entirely different voyage to South America. She could not have done this without the consent of the defendant who was actively financing her adventures and collaborated in depriving plaintiffs of the benefits of their contract. The claim asserted is in the old common-law action of indebitatus assumpsit, over which a court of admiralty has no jurisdiction. It would make no difference whether the claim was based upon unjust enrichment or fraudulent representations—of which there were none in this case; in neither event would recovery lie in admiralty. United Transp. & L. Co. v. New York & Baltimore T. Line, 2 Cir., 185 F.

386, 389; Minturn v. Maynard, 17 How. 477, 15 L.Ed. 235; Israel v. Moore & McCormack Co., D.C., 295 F. 919. The jurisdiction of the District Court was based on diverse citizenship of the parties. The action is for recovery at common law and under the rule of Eric R. v. Tompkins, 304 U.S. 64. 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, is governed by the law of the State of New York.

The New York Appellate Division, First Department, rendered a decision in McInnes v. Equitable Trust Co., 197 App. Div. 649, 189 N.Y.S. 518, involving a state of facts closely similar to those here. The defendant there was a creditor of the shipowner. The shipowner, in order to secure a loan by the defendant, vested the latter as mortgagee with the legal title to the vessel and thus enabled its creditor to control the disposition of the vessel. The parties had an arrangement whereby the shipowner, with the knowledge and consent of the defendant, operated the steamer, entered into affreightment agreements, and issued bills of lading for the carriage of freight by the steamer. Under the contract between the defendant and the shipowner, the freight moneys received were to be paid to the defendant and applied by it to the payment of the loan until that had been repaid in full. There, as here, prepaid freight was received by the defendant for a voyage that was never carried out. The court held that in view of the contract requiring these moneys to be turned over to the defendant, the latter took them, charged with knowledge and charged with all the obligations with which the original owners would have been charged for failure of the vessel to make the voyage. The court held that the contract made the shipowners "the agents of the defendant to the extent at least that it charged the defendants with the knowledge that these moneys were freight moneys and were subject to repayment in case the voyage be not made." In this connection the court stated that it was not material whether the original shipowners were guilty of fraud in inducing the plaintiffs to make the contract and prepay the freight.

Accordingly upon the record which was presented by a demurrer to the complaint of the shipper by the creditor, the latter was required to make restitution of the freight money, with leave however, to withdraw its demurrer and replead if it so desired.

The theory upon which the above case proceeds was that of unjust enrichment. Perhaps another theory might have been employed, namely, that the defendant had committed a tort in collaborating with the shipowner to use freight moneys for purposes never intended when the moneys were originally paid. In the instant case, the reservation of controls * over Intercontinental's management of the Schooner through its mortgage on the Constellation, its right to prevent the ship from going on a voyage and its dominant financial relation

---

* This is shown by the following terms of the contract between Intercontinental and the defendant:

10. Intercontinental and Caragol promise and agree that all freight contracts and freight bills, or other written evidence thereof, will be conspicuously stamped with the following legend:

"The proceeds of this bill have been assigned to and are the property of Bankers Commercial Corporation, 270 Madison Avenue, New York, N. Y. Please make all remittances to them at that address."

11. All freight collections will be made directly by Bankers but should any collections come into the hands of either Intercontinental or Caragol, they will be immediately transmitted to Bankers in the form received, and Bankers may take any steps it deems necessary to insure the receipt by it of said collections including, but not restricted to, the placing of a representative at any and all times in the offices of Intercontinental and Caragol.

12. Prior to the making of any advances hereunder, Intercontinental will furnish Bankers with evidence satisfactory to Bankers to show the purposes for which the money advanced will be used. All checks issued by Intercontinental against said advances will be exhibited to Bankers prior to delivery.

16. It is mutually understood and agreed that the Schooner "Constellation" will remain in the Port of New York until the entire indebtedness of Caragol and Intercontinental to Bankers has been liquidated in full.

to Intercontinental contributed to the causing of a breach of contract between Intercontinental and those shippers who had advanced freight payments on the South African voyage. Such a proved relation was sufficient to negate the privilege enjoyed by creditors in certain circumstances of interfering with the business relations between their debtors and third persons. See 4 Restatement of the Law, Torts § 769(d). In passing on the inequity of the defendant's retention of the freightage in the case at bar, it is to be noted that it did not merely collaborate in the breach of contract, but also collaborated in what may be considered the commission of another tort by Intercontinental. For it has been held that where a ship, after receiving cargo on board, issuing bills of lading, and receiving prepayment of freight, fails to sail, the remedy of the shippers may at their option lie in tort for breach of a duty imposed upon carriers by common law. The Henry W. Breyer, D.C.Md., 17 F.2d 423; see also L. Hand, J., dissenting, Mallory S. S. Co. v. Garfield, 2 Cir., 10 F. 2d 664, 668, 669.

It is true that Justice Pecora reached a contrary result in Republic Chemical Corporation v. Bankers Commercial Corporation and Intercontinental Steamship Lines, Inc., —— Misc. ——, 73 N.Y.S.2d 318, rendered at Special Term, Part V, of the New York Supreme Court, and affirmed without opinion by the Appellate Division, 269 App.Div. 736, 54 N.Y.S.2d 396. There, as in the case at bar, freight moneys had been prepaid by a shipper and its cargo laden on the Constellation. The same contract between Intercontinental and Bankers Commercial Corporation that we have outlined was there involved. The shipper, Republic Chemical Corporation, sued Bankers Commercial Corporation and Intercontinental for repayment of the amount of prepaid freight because of the abandonment of the voyage by Intercontinental. It is clear from Justice Pecora's decision that he did not question the validity of the principles we have discussed above as constituting the "New York law." The difference in result arose, appar-

ently, from a different view of the facts than that taken by the trial judge in the District Court below. Thus Justice Pecora stated that [73 N.Y.S.2d 323]:

"It is well established by a long line of Federal decisions that pre-paid freight moneys are to be paid back to the shipper by the carrier in the event that the boat, which was intended to carry the shipment, does not make the voyage. That doctrine was given ample recognition by our State courts in such cases as the McInnes case. If the evidence before me had shown that the Bankers Commercial Corporation had retained these freight moneys in its possession or under its control, up to the time that the cause of action arose in favor of the plaintiff upon the failure of Intercontinental to fulfill its obligations under its affreightment contract with the plaintiff, in my opinion the principle enunciated in the McInnes case would amply justify a recovery of those freight moneys by the plaintiff from the Bankers. * * * But the most important factual difference between this case and the McInnes case, in my opinion, is the fact that, in the McInnes case, the defendant had received and retained the freight moneys there in suit, and was in possession of such moneys at the time the cause of action accrued in favor of the plaintiff, whereas, in this case, the freight moneys had been released and returned by Bankers to Intercontinental long before the accrual of plaintiff's cause of action."

It is to be noted that Justice Pecora based his distinction between the case before him and the McInnes decision on the fact that the freight moneys had there been "released and returned by Bankers to Intercontinental long before the accrual of plaintiff's cause of action." He ignored the fact which, moreover, does not appear to have been raised in the briefs before the Appellate Division, or to have been at least actively raised at the trial, that the moneys returned by Bankers to Intercontinental were loaned to Intercontinental upon a fresh consideration and, therefore, could not have been a return of the freight moneys that had been assigned to Bankers Commercial Corporation. This new con-

sideration was described by defendant's witness, Conlan, in the record before us and by Judge Symes in Finding 13 and resulted in the receipt by the defendant of a net of $16,602 from its security as well as in the liquidation of a libel against the ship Rawding upon which the defendant held a subordinate mortgage.

In addition to this it appears from the record in the Republic Chemical Corporation case in the Appellate Division that a modification of the contract was there made between Intercontinental and that shipper whereby the Constellation transported the goods of the latter to Norfolk, Virginia, under an arrangement whereby they were to be transshipped on the Rawding to South Africa, and that this forwarding arrangement was only defeated by the refusal of a "shipper's committee" that had taken possession of the Rawding to take the goods on board.

It appears from the foregoing that the facts as presented before Justice Pecora and the Appellate Division and the basis for his decision differed essentially from those in the case at bar.

■ The bills of lading here provided "* * * that the freights prepaid will not be returned, goods lost or not lost." It is argued that under the decisions of the Supreme Court in Allanwilde v. Vacuum Oil, 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15; International Paper v. Schooner Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318, and Standard Varnish v. Steamship "Bris", 248 U. S. 392, 39 S.Ct. 150, 63 L.Ed. 321, there could be no recovery of the freights here because of the broad provisions of the bills of lading. But those decisions were based on, and in terms limited to, situations where there was a failure of the voyage induced by a restraint of princes or governments.

Non-recoverability in those cases was due to an embargo by the United States Government, an exception provided for in the bills of lading. Here the frustration of the voyage was due to the inability of Intercontinental to obtain sufficient cargo and freights to render the voyage of the Constellation to South Africa profitable, i. e., to a deliberate choice on the part of Intercontinental and the defendant which controlled the sailings of the Constellation to send the ship on a different voyage. Such a situation is not, in our opinion, within the rule of the Supreme Court decisions above referred to.

■ In view of the foregoing we are of the opinion that the New York decisions sustain the judgment of the court below. This is because the defendant had sufficient control over the sailing of the Constellation to render it liable as a collaborator in the abandonment of the voyage to South Africa. It may be argued that the defendant did no more than allow the vessel to leave New York on a different voyage and did not direct the making of such a voyage or the abandonment of the former one. But concededly it could have prevented the abandonment of the original voyage and would seem to have facilitated the change because the cargo for South Africa was slow in coming in and it preferred to have the vessels of its debtor speedily employed instead of losing time in waiting to obtain South African freight. It not only consented to the new voyage but it had its own agent in the office of Intercontinental collecting the assigned freights on its behalf. It, therefore, must have been a direct and purposeful participant in the fruits of the new voyage.

The New York decisions are sufficiently clear and controlling to justify the recovery granted by Judge Symes.

Judgment affirmed.