SOUTHEASTERN OIL FLORIDA, Inc.

v.

UNITED STATES.

PACO TANKERS, Inc.

v.

UNITED STATES.

Nos. 50296, 117–52.

United States Court of Claims.

Nov. 3, 1953.

J. Franklin Fort, Washington, D. C., Radner, Zito, Kominers & Fort, Wash-

ington, D. C., and Mr. Robert V. Faragher, New York City, on the briefs, for plaintiffs.

Ernest C. Baynard, Washington, D. C., Asst. Atty. Gen. Warren E. Burger, Washington, D. C., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff, Southeastern, purchased the type T2–SE–A1 tanker *Kern Hills* from the former United States Maritime Commission on January 27, 1948, under a contract dated January 14, 1948. The plaintiff, Paco, purchased the type T2–SE–A1 type tanker *SS. Northfield* from the Commission in May 1948. In each case the Maritime Administrator, the successor to the Maritime Commission, in determining the ultimate purchase price of the vessels, charged the purchaser with the cost of "slotting and strapping" the vessels. The plaintiffs contend that they should not have been so charged, and sue to recover the amounts charged.

Until a few years before World War II, the steel plates of vessels were joined by overlapping and riveting. During the early years of the war, the all-welded method of construction was much used. The welded seams had the advantage of being leak proof, and the welding process was more rapid than the riveting process. But the resulting structure was rigid, too rigid to withstand the strains. Some of these vessels developed cracks which, once started, would spread from plate to plate throughout the vessel. Some welded Liberty ships and at least one welded T2 tanker broke in two. The slotting and strapping device was brought forward to correct the defects in welded ships. Four longitudinal slots, each about two hundred feet long, were cut in the midsection of the hull of the vessels. These slots were then covered with steel straps riveted to the plates of the ship. The straps applied to the T2 type tankers weighed about eighteen tons for each ship.

The sales by the Commission to the plaintiff were made under the Merchant Ship Sales Act of 1946, 60 Stat. 41, as amended, 62 Stat. 1199, 50 U.S.C.A.Appendix, § 1735 ff, 46 U.S.C.A. § 864a. The scheme and purpose of that statute are discussed in detail in our decision in A. H. Bull Steamship Co. v. United States, 108 F.Supp. 95, 123 Ct.Cl. 520, and Southeastern Oil Delaware, Inc. v. United States, 109 F.Supp. 395, 124 Ct. Cl. 561, and will not be treated extensively here. The Act provided that the Commission's surplus merchant ships should be sold to qualified operators at prices to be fixed by a statutory formula for each type of ship, with certain permissible variations from that formula. One of the permissible bases for an increase in the price of a particular ship was the presence of "desirable features" on that ship, which features were not present on the standard ship of that type.

By the time the tankers involved in this suit were sold to the plaintiffs, the defects in the all-welded ships had been discovered, and such ships could not be licensed for operation unless they had been so strengthened. In the language of the industry, such a ship would not be "in class" unless it was so strengthened. The Ship Sales Act required that each ship sold be put "in class" by the Commission, or that the purchaser be allowed a reduction in the purchase price sufficient to pay for putting the ship in class.

Before the plaintiffs, in 1947, applied to the Commission to purchase the tankers which they ultimately received, the Commission had decided to grant to purchasers an allowance on the purchase price to compensate for the cost of slotting and strapping. The statute required the Commission to do this, since without this strengthening the vessels would not be in class. But what the Commission granted with one hand, it took back with the other. For it inserted a provision in the contract of sale that the slotting and strapping should be regarded as a "desirable feature," the cost of which should be added to the standard price of

the ship. It required a deposit of an amount tentatively determined to be that prospective cost and later adjusted that amount, in the case of each of the ships to $16,600.

The plaintiffs protested the inclusion of this provision in their contracts, and the collection of the money from them. But they signed the contracts and accepted the ships. In their memoranda in support of their motions for summary judgment they have made an extensive argument that slotting and strapping was not a "desirable feature" within the meaning of the statute, and could not lawfully be charged for as such. The Government now concedes that the plaintiffs are right, on this point. But, the Government argues, the Commission reached substantially the right result, though it followed the wrong road to reach that result.

The Government now urges that the cost of slotting and strapping should be added to the price of the standard T2 tanker, in determining the statutory sale price, since such tankers, without this strengthening, were found to be inoperable. It recognizes that the statutory sale price was fixed, as the statute required, on the basis of the pre-war cost and the wartime cost of this type of ship; that, as so fixed, it included no amount for slotting and strapping, since no such work was done when the vessels were built. But, it says, no vessel can be a standard vessel unless it is operable, that is, in class, and none of the several hundred T2 tankers could be in class without slotting and strapping, therefore the standard T2 tanker is one that is slotted and strapped, and the cost of doing so is a part of the cost of a standard T2 tanker. It says that it could have, when slotting and strapping became a class requirement in 1947, repriced the standard T2 and published the new price in the Federal Register as the statute required; that it did not do so because the plaintiffs, though under protest, signed the contracts of purchase agreeing to pay for the slotting and strapping as a desirable feature, and that

the plaintiffs are estopped from now raising the question of noncompliance with the statutory requirement of publication.

The plaintiffs point out that the T2 tankers, when built in 1944, were in class and operable; that they were the standard vessel of that type and their cost as built was the cost which the Commission was required to find and use, and which it did use in computing the statutory sales price; that such tankers were sold for that price before May 1947, when slotting and strapping was made a legal requirement to put such vessels in class; that the tendency to crack was merely a defect which had to be repaired in order to put them in class, and that the Ship Sales Act required the Commission to do that at the expense of the Government, either by payment for it, or reduction in the purchase price. The plaintiffs says that the statutory pricing formula requires that adjustments in the sales price for class work shall always be downward. Section 3(d) (1) says, "If the Commission is of the opinion that the vessel is not in class, there shall be subtracted the amount estimated by the Commission as the cost of putting the vessel in class." Other statutory references to the cost of class work similarly refer to reductions or allowances in the sales price. The only statutory authorization for an increase in price is Section 3(d) (1) relating to desirable features, and the Government does not now contend that slotting and strapping added a desirable feature.

We think that the Government's present contention for, in effect, redefining the standard T2 tanker as if it had been, when built, slotted and strapped, and adding the cost of that work to its cost, is not sound. These vessels were built and put in operation as standard, operable vessels. They developed defects. The only difference between their defects and those which occur in all vessels is that the defect here in controversy existed in all of them, instead of only in one or several. But, the defects having been discovered, the policy of the statute was that the defects should be repaired so

that the ships could be operated. The repairs, to make Government ships operable and salable, were, the statute says, to be made at the expense of the Government.

██ If, in the light of the disclosed defect, such ships were again being built, they would, no doubt, be built differently. But whether the standard ship would avoid the defect by being slotted and strapped, or in some other way, we can only conjecture. As to the ships here in question, they started out as standard ships of their type, they developed defects, and the defects had to be fixed to make them operable and salable. That fixing was, we think, under the statute, to be done at the expense of the Government.

██ As to the Government's argument that the plaintiffs are estopped from asserting rights given them by the statute, because they signed contracts, though under protest, agreeing to treat slotting and strapping as a desirable feature, which the Government now concedes it was not, we considered a similar contention in A. H. Bull Steamship Co. v. United States, 108 F.Supp. 95, 123 Ct. Cl. 520, at page 528. We said that the parties could not, by contract, change the terms prescribed by the statute for the sale of the ships.

We conclude that the Government was not entitled to collect from the plaintiffs any amount for slotting and strapping the tankers, and that each plaintiff may recover the amount so collected from it.

### Southeastern's Claim For Repair Charges

Paragraph IV of Exhibit A of the contract of purchase under which Southeastern acquired the tanker *Kern Hills* contained the following language:

" * * * IV. Repairs. The Buyer, at the time of delivery of the vessel(s) by the Commission to the Buyer, shall pay to the Commission, the cost to the Commission, as determined by the Commission, of certain repairs as follows:

"(a) Vessel(s) operating and not recently withdrawn from lay-up:

"*Kern Hills*

"Repairs made on the vessel(s) by or for the Commission, subsequent to July 1, 1947, up to the class date (including repairs in hand on such date) to the extent that such repairs are in excess of the work which would have been performed by the Commission had it been preparing the vessel(s) for sale in accordance with its policy relating to class sales to American citizens for American flag operation, less the sum of $6,000 per vessel per month for each calendar month (or portion thereof in excess of 15 days) after completion of such repairs, during which the vessel(s) shall have been operated by or for the Commission subsequent to July 1, 1947. * * * "

Pursuant to this provision of the contract, the Government required Southeastern to deposit $21,781 at the time it acquired the ship. When the liability was finally computed, the Government returned all but $5,116.79 of this amount. Southeastern sues for the $5,116.79.

The vessel *Kern Hills* was not in the laid-up fleet, but was and had been in service for the Government, being operated by a general agent under a cost-plus contract. In applying the above provision of the contract, the Commission listed all repair expenditures which had been made on the ship from July 1, 1947, to the date of sale to Southeastern in January 1948. Then the Maintenance and Repair Division of the Commission analyzed the list and eliminated those items which would have had to be done to put the vessel in class, according to the class requirements at the time the repairs were made. The sum of the items not thus eliminated was charged to the plaintiff, Southeastern, it was given the $6,000 per month credit, and the ultimate charge of $5,116.79 was thus arrived at.

The plaintiff, Southeastern, says that there was no authority given to the Com-

mission by the Ship Sales Act to make this charge, or to require purchasers of ships to agree to it. The Government points to no provision of the statute authorizing the charge. It urges, however, that the charge was fair because otherwise the purchaser of a ship which was in operation would get a ship on which the Government had made expenditures not necessary to put the ship in class, and would get the use of the ship more promptly than if he took a ship from the laid-up fleet.

The repairs charged to the plaintiff included some items that were not required to put the ship in class at the time the repairs were made, but were, because the class standards had been raised, necessary to put the ship in class at the time it was sold to the plaintiff. As to those, it would seem that if it had not been for this provision of the contract,· they would have had to be done at Government expense. Other items, such as adjusting compasses and cleaning boilers, done some months before the ship was sold to the plaintiff, would seem to have been recurring expenses,· of no permanent benefit to the ship.

The Government says that by Public Law 269, 61 Stat. 585, 603, amending the Ship Sales Act in July 1947, the Commission had been denied authority to perform work on vessels "to be sold" and that, therefore, if it had not recouped the cost of repairs made after that date, it would have violated this law. Before Public Law 269, the Commission had been putting vessels in class at its expense out of appropriated funds. After Public Law 269, the Commission had no appropriated funds for that purpose; hence, it gave allowances to purchasers of the cost of putting the vessels in class. The change was a bookkeeping change, having no ultimate effect on the Government's finances. The Commission was not forbidden to operate vessels, nor to keep them in repair so that they would operate. The revenues which it derived from operation were a revolving fund available to the Commission.

■ We think that the repairs provision, inserted in the contract by the Commission, was not authorized by the Ship Sales Act. That Act provided in detail how the sales price was to be computed and what charges and credits were to be allowed to purchasers. Congress knew that there were hundreds of ships to be sold, some laid up and some operating. It knew that, apart from matters adjustable under the provisions of the statute relating to desirable features, and to the cost of putting vessels in class, which matters the Commission was authorized to consider in setting prices, there would be great differences in the condition of different ships, with regard to the condition of paint, the cleanness of boilers, the adjustment of compasses, etc. If such matters were to be allowed to affect the sales prices of ships, Congress might just as well have lodged complete discretion in the Commission to set the price of ships. But neither Congress nor the Commission was willing that that should be done. So Congress laid down the formula, and, we think, showed thereby that other items not included in the formula should be disregarded.

Our conclusion is that the repair charges with which the plaintiff, Southeastern, was charged were not authorized by the statutes. We think that the contract provision purporting to authorize them was void, for the reasons already given.

The plaintiffs' motions for summary judgments are granted. The plaintiff, Southeastern, may have a judgment for $21,716.79. The plaintiff, Paco, may have a judgment for $16,600.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.