SWORD LINE, Inc., Appellant,

v.

UNITED STATES, Appellee.

No. 160, Docket 23723.

United States Court of Appeals
Second Circuit.

Argued Nov. 7, 1955.

Decided Dec. 14, 1955.

Theodore J. Breitwieser, New York City, for appellant.

Benjamin H. Berman, New York City, Warren E. Burger, Asst. Atty. Gen., Paul W. Williams, U. S. Atty., Dept. of

Justice, New York City, Leavenworth Colby, Chief, Admiralty & Shipping Section Dept. of Justice, Washington, D. C., of counsel, for appellee.

Before CLARK, Chief Judge, and HAND and WATERMAN, Circuit Judges.

HAND, Circuit Judge.

The libellant appeals from a decree in the admiralty, dismissing its libel upon "exceptive allegations," filed by the respondent. The claim, as alleged in the libel, was as follows. The Maritime Commission had chartered to the libellant forty-four vessels upon a "bare-boat charter," by virtue of authority granted by § 5 of the Merchant Ships Act of 1946.[1] Subdivision (c) of this section incorporates § 709 of the Merchant Marine Act of 1936,[2] which provides that, if at the end of any calendar year after such a charter is executed, the "cumulative net voyage profits" shall be greater than ten per cent of "the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum." This language the Commission has construed to allow it to reserve as part of the hire more than one-half the surplus of the charterer's profit above ten per cent; and for this reason the charter in suit contained a sliding scale for the division of profits. The Commission's share was one-half the excess of profits over 10%, when the excess was not more than $100 a day; three quarters, when it was between $100 and $300; and nine-tenths, when it was over $300. The libellant accepted these terms; filed accounts with the respondent, "based upon the accountings prepared by respondent"; and paid the resulting sums as part of the hire. The suit is based upon

the proposition that § 709 fixed the division of profits at fifty per cent of the excess profits regardless of its amount, and that the Commission unlawfully forced the libellant to pay $1,800,000 above what was due.

The "exceptive allegations" alleged that the Commission put an end to the charter on July 27, 1948, by virtue of a reserved power; and that on July 30, 1948, the libellant filed a petition for an "arrangement" under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. On January 11, 1950, the Commission filed a claim in this proceeding for about $4,000,000, and on February 23, 1952, the libellant filed an "amended plan of arrangement," in the fourth paragraph of which it agreed that the respondent should "be paid the sum of $1,250,000 in full and complete compromise and settlement of all indebtedness of the Debtor to the United States of America and of all claims existing on July 30, 1948 between the United States of America and the Debtor." The respondent accepted the plan as so amended, and the referee in bankruptcy confirmed it on July 31, 1952. The libel was filed on July 28, 1954. The respondent raises two points in answer to the claim. First, it says that the claim arose on October 26, 1948, the day when the libellant surrendered the ships in accordance with the charter; and that, as that was more than two years before the libel was filed, the district court had no jurisdiction over the suit.[3] Second, it says that in any event the confirmation of the "arrangement" was a bar to the claim upon the merits. Judge Murphy did not pass upon the first point, because the respondent did not urge it; but he supported the respondent on the second and dismissed the libel by a decree which must have meant a dismissal upon the merits, though it did not so declare.

1. 60 Stat. at L. 41, 50 U.S.C.A.Appendix, §§ 1735 et seq., 1738.

2. 49 Stat. at L. 1985, 46 U.S.C.A. §§ 1101 et seq., 1199.

3. Sgambati v. United States, 2 Cir., 172 F.2d 297.

346

Before considering these two issues, we must decide whether the district court had any jurisdiction in admiralty over the controversy; for, although neither side has raised this objection, it is a question· that under familiar law we must answer. The claim has for its premise that § 709 of the Merchant Marine Act of 1936 made illegal that portion of "clause 13" of the charter that stipulated for the graduated scale of profit-sharing instead of for a division half and half, regardless of amount. It might be argued, if the libellant is·right about § 709, that no contract was ever made, because the section made the libellant's promise unenforceable and there were therefore no mutual promises. On the other hand, if the statute did indeed limit the Commission to an even division of profits, it was the Commission's duty so to limit the libellant's promise; and we should not assume that the Commission would not have chartered the ships, unless it was to receive the unlawful hire. Obviously, we may impute to the libellant willingness to pay the lesser hire; so that it is proper to proceed as though there had been a contract for an even division, and nevertheless the Commission had compelled the libellant to pay more than the disputed hire.[4] The suit is therefore in quasi contract for money had and received. In United Transportation & Lighterage Co. v. New York & Baltimore Transportation Line, 2 Cir., 185 F. 386, this court in 1911 after a full examination held that such claims were not so far maritime as to be justiciable in the admiralty; the Ninth Circuit held the same thing in 1926;[5] and in a dictum we repeated the doctrine in 1947.[6] Even though I were better convinced than I am that our original decision was wrong, I should feel it my duty to follow it and to leave the question to the Supreme Court, were it not

for Krauss Bros. Lumber Co. v. Dimon S.S. Co., 1933, 290 U.S. 117, 54 S.Ct. 105, 78 L.Ed. 216, of which we were apparently not aware when we decided Silva v. Bankers Commercial Corporation, supra, 163 F.2d 602, 603. The Supreme Court held that, when a carrier had exacted more than the stipulated freight, the shipper might recover the excess by a suit in the admiralty to enforce a maritime lien. There could of course be no doubt that, if the owner had refused to deliver the goods until the excess was paid, he would have broken his promise to deliver and the suit would be cognizable in the admiralty, although the damages might not be measured by the unlawful excess. That was not—at least as I read the opinion—the Court's reasoning; it assumed that the goods had been delivered, and put its decision upon the premise that the carrier had promised, not only to deliver the goods for the agreed hire, but thereafter not to demand anything further; and such a demand, if it was indeed a breach of the maritime contract, was of course cognizable in the admiralty. Having so interpreted the contract, the Court did not find it necessary to decide whether a claim in quasi-contract, based upon an unjust exaction after the contract had been completely performed, was also cognizable in the admiralty. For my own interpretation of the decision I rely upon what Stone, J., said in 290 U.S. 107, on page 124, 54 S.Ct. on page 107, which is all there is on the point: "Even under the common law form of action for money had and received there could be no recovery without proof of the breach of the contract involved in demanding the payment, and the basis of recovery there, as in admiralty, is the violation of some term in the contract of affreightment, whether by failure to carry or by exaction of freight which the contract did not authorize."

4. A. H. Bull Steamship Co. v. United States, 108 F.Supp. 95, 99, 123 Ct.Cl. 520; Southeastern Oil Florida, Inc., v. United States, 119 F.Supp. 731, 734, 127 Ct.Cl. 409.

5. Home Insurance Co. v. Merchants Transportation Co., 9 Cir., 16 F.2d 372.

6. Silva v. Bankers Commercial Corporation, 2 Cir., 163 F.2d 602, 603.

My brothers do not agree with such a limited understanding of the decision; they think that it should be read so as to cover claims in quasi-contract; but under either understanding it is clear that the district court had jurisdiction over the suit at bar.

■■ That does not, however, dispose of the jurisdictional objection raised by the respondent: *i. e.*, that the suit was filed more than two years after October 26, 1948, the day on or before which all the chartered ships had been returned to the Commission. If the claim arose on that day, concededly the libel was too late, for October 26, 1950 was the last day of the two years that followed.[7] It is common ground that this period of limitation, like all such periods, did not begin to run until the first day when the obligee could have brought suit; and my brothers think that the libellant could have sued October 26, 1948, because all the facts were then in existence on which the computation of the profits depended. I agree that the period of limitation ordinarily does begin to run as soon as all the facts have occurred from which the claim can be liquidated, and that the statute is not tolled because a computation, however complicated, is necessary to ascertain its amount. However, there is a well-recognized exception in the case of mutual accounts, and the right answer here turns upon whether this was such an occasion. In Spring v. Gray, 6 Pet. 151, 8 L.Ed. 352, the owner sued to recover as freight half the net profits made upon the investment abroad of the proceeds of a cargo shipped for a voyage to Algiers. The defendant pleaded the Statute of Limitations and the libellant answered that the action was upon an "open" account. The Court said that the account was not "open" because, 6 Gray at page 165, although "the sales of the outward and inward cargo and the expenses attendant on the enterprise must be examined to ascertain the amount of freight," the account was nevertheless "founded on the trade of the affreighter alone, to which reference must be made in order to ascertain the amount of the freight." That decision, therefore, did hold that the statute would have been a bar in the case before us, if the suit had been, either by the Commission against the libellant only to recover the proper proportion of its profits, or by the libellant only to recover payments that it had made in supposed compliance with its obligation. It is indeed true that it was to recover payments which the Commission asserted were due under the charter; but it seems to me of critical importance, not only that the Commission decided *ex parte* how much these should be, but that they were to be provisional or contingent payments. They were described as "preliminary," to be paid "at such times and in such manner and amount as may be required by the Owner"; and I think that, when they became items in later accounts between the parties, those accounts were "mutual." This follows, I submit, from the language of "Clause 13" that immediately followed, which provided that the payments were to be "subject to adjustment either at the time of the rendition of preliminary statements, or upon the completion of each final audit by the Owner." As I read the plan, it was that the libellant must pay whatever the Commission provisionally fixed as its share of the profits; that these amounts should be finally determined either by "statements" rendered, or by final audit of the Commission. There can be no doubt that this involved an account made up of cross items, for upon the "adjustments" "such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the charterer as may be required." In short, the profits to which the Commission would be entitled were to remain in abeyance and to be ascertained by seeing how they matched with the libellant's

---

7. Sgambati v. United States, supra, 2 Cir., 172 F.2d 297.

"preliminary" payments. True, when the suit was brought, the facts had all existed for more than two years on which the "adjustments" would be made; but the balance either way was not due until they had been made, and no suit could have been filed until then, at least without showing that the Commission had refused to make the "adjustments." Indeed, to me it would appear most unjust to bar the libellant's claim without such evidence.

Since, however, my brothers think otherwise, we need not decide the merits of the appeal, and I should not discuss them, were it not that they prefer to rest our decision as well on the merits as on the point of jurisdiction. We all think that the confirmation of the "arrangement" released any claims the libellant may have had. In addition to the language already quoted from the fourth article of the "amended arrangement," it later provided that "upon the acceptance of the plan by United States of America and its confirmation by the Court, the payment by the Debtor of the amounts provided for in this Article 4 shall constitute a full and complete satisfaction, binding upon the Debtor and upon the United States of America, of any and all claims and indebtedness, of whatsoever nature and description between the Debtor and the United States of America existing on July 30, 1948." That not only released the libellant from any claims that the Commission might have against the libellant; but also released the Commission from all claims that the libellant might have against the Commission. Indeed, the libellant challenges its scope only because, immediately following the words just quoted, the article goes on to exclude ship mortgages to the United States, contingent liabilities of the libellant to third persons, present or future, and "any claims for refunds of taxes accrued prior to July 30, 1948."

The libellant argues that this specific release of existing taxes limited the preceding words of general release within the doctrine that general words of release, followed or preceded, by a special and limited release are to be read as limited to the specified claim and are really redundant. We have recently applied this doctrine three times,[8] and have no wish to disturb its authority; but, as we have always said, it is at most only a canon of interpretation, and in the case at bar it would frustrate the most important purpose of the "arrangement" to limit it to the taxes specified. The petition to the Bankruptcy Court alleged that it was the Commission's seizure of the ships that had compelled the libellant to seek the "arrangement," and that, not only did it owe $2,400,000 for hire, but that the Commission owed it $3,400,000; thus necessarily bringing into the proceeding the amount of that claim. The taxes at stake were only a trifling part of the mutual claims, and to confine the composition to them would be to leave out the most important elements of the whole proceeding. It makes no difference whether in July, 1948, the libellant, as it now asserts, may not yet have learned that the Commission had collected from it more than the statute allowed; for it stands beyond cavil that the prime purpose of the "arrangement" was to wipe the slate clean as between the parties.

Finally (let me add for myself), even though I may be right in thinking that the libellant could not have brought any action until long after October 26, 1948, the release still discharged the libellant's claims. The "amended arrangement" was not executed till February 21, 1952, and the fact that any suit to recover whatever claims the libellant had, was conditional upon some "adjustment," did not prevent the unadjusted claims themselves from being released *in praesenti*.

8.  Vines v. General Outdoor Advertising Co., 2 Cir., 171 F.2d 487, 492; Kelcey v. Tankers Company, 2 Cir., 217 F.2d 541, 547; Eagle Lion Films v. Loew's Inc., 2 Cir., 219 F.2d 196, 198.

The decree will be affirmed, and the libel dismissed for lack of jurisdiction of the district court.

Decree affirmed.