**ALASKA STEAMSHIP COMPANY**

v.

**UNITED STATES.**

**No. 190–54.**

United States Court of Claims.

Jan. 15, 1958.

As Amended on Denial of Rehearing

May 7, 1958.

J. Franklin Fort, Washington, D. C., for plaintiff. Kominers & Fort, Washington, D. C., were on the briefs.

Justin S. Colin, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Stephen C. Bransdorfer, Washington, D. C., was on the briefs.

MADDEN, Judge.

The plaintiff, a corporation of the State of Washington, seeks to recover $53,862 plus any interest allowable thereon, which it claims the defendant, acting through the Maritime Commission and later the Maritime Administration, overcharged it for the purchase of a vessel.

The plaintiff, on July 16, 1948, purchased a standard C1–M–AV1 type dry-cargo vessel called the Terminal Knot from the Maritime Commission under the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A.Appendix § 1735 et seq. We have had occasion to consider this statute in a number of cases. See A. H. Bull Steamship Co. v. United States, 123 Ct.Cl. 520; Southeastern Oil Florida, Inc., v. United States, 119 F. Supp. 731, 127 Ct.Cl. 409; and two cases this day decided, Nautilus Shipping Corporation v. United States, Ct.Cl., 158 F. Supp. 353 and Jackson v. United States (Southern Trading Company v. United States), Ct.Cl. 158 F.Supp. 357. The Act provided for the sale of the Government's merchant ships, acquired for war purposes, to private owners. It set formulas by which sale prices could be determined without, or with a minimum, of haggling between the Maritime Commis-

sion, which was the Government's sales agency, and the purchaser.

In the drafting of this statute, Congress recognized that the pre-war cost of building a dry-cargo ship in an American yard was about twice the cost in a foreign yard. If ships could be sold at all at American prices, the purchaser would be saddled with a capital investment which would handicap him in his operation in competition with foreign built ships. Section 3(d) of the Act provided that the "statutory sales price" of dry-cargo ships should be 50% of the pre-war domestic cost of that type of ship. In subsections 1 to 4, it provided for further deductions, in proper cases, from that 50% price. These deductions were for the cost of putting the vessels in class, for the lack of desirable features standard to that type of vessel, and for depreciation. It was recognized that the allowable deductions, particularly the deduction for depreciation, might carry the sales price very low and thus induce purchasers to select the older ships with the greatest depreciation. The Government, however, wanted to get the newer and better ships into private operation in order to build up a reputable American merchant fleet. For this reason, and for the further reason that there were members of Congress who feared that the whole sales program might be something of a giveaway, considering that the actual cost of building ships during the war was greater than the pre-war cost on which the 50% figure was based, a floor or absolute minimum sales price was set. Section 3(d), in its last paragraph, provides that no adjustment should be made which would carry the sales price below, in the case of dry-cargo vessels, 35% of the domestic war cost of such vessels.

In the consideration in Congress of this floor price provision, the discussion assumed that, in all cases, the 35% of domestic war cost would be lower than the 50% pre-war domestic cost, unless that 50% figure was reduced by class allowances, desirable feature allowances or depreciation. If such adjustments would have carried the price below the 35% floor, they would not be allowed to do so. The reduction process would have to stop at the floor.

In the instant case, because of the unusually high cost of building ships of the type in question late in the war period, 35% of the domestic war cost of the ship was $53,862 more than 50% of the pre-war domestic cost. That meant, of course, that no reduction could be taken for class allowances, absence of standard desirable features, or depreciation, and the plaintiff does not claim any such reduction. But the plaintiff does claim that it could not be required, under the statute, to pay more than 50% of the pre-war domestic cost prescribed in section 3(d). Stated graphically, the plaintiff says that it was entitled to buy the ship for less than the floor price.

There are things to be said for the plaintiff's position. In the discussion of the bill which resulted in the Merchant Ship Sales Act, there was emphasis upon the purpose, noted above, not to require American enterprises to make a capital investment in their ships which would handicap them in their competition with foreign companies. H.Rept. No. 831, 79th Cong., 1st Sess., pp. 4–7. The 50% of pre-war domestic cost figure was regarded as the measure of the investment of foreign companies. If Americans were required to pay more than that 50%, that policy would, to that extent, be violated. In the discussion of the bill, the intent was expressed that the extraordinary costs of shipbuilding during the war should not be saddled upon the post war merchant marine, but should be borne by the Government. S.Rept. 807, 79th Cong., 1st Sess., pp. 2–3.

In the text of section 3(d), we have the general statement of the "statutory sales price" of 50% and then the statement "such amount in each case being adjusted as follows: * * *." Then we have the three provisions for reductions from the 50% figure, viz., for class allowances, absence of standard desirable features, and depreciation. Then we have the statement "No adjustment * * *

shall be made under this Act which will result" in a sales price of less than 35% of the domestic war cost. The word "adjustment" last quoted would seem to have reference to those items covered by the immediately preceding paragraphs, which were introduced by the phrase "adjusted as follows."

Section 4 of the Act says that the Maritime Commission shall sell ships to any citizens who are properly qualified "at the statutory sales price." This obviously does not refer to the 50% figure, though in section 3 that is called the "statutory sales price," because farther on in section 3 are the provisions for the adjustments which are mandatory and which will reduce, or, in one instance not here relevant, increase the 50% figure, and the provision for the 35% floor figure. The "statutory sales price" referred to in section 4 must be the price which will be arrived at by applying the provisions of the statute. It is thus of no help to us in determining what the statute means.

When members of Congress were disturbed because it seemed that ships built at a great cost during the war were about to be sold for a minor fraction of their cost, the floor price, based upon that actual war cost, was inserted in the bill to reassure them. As we have said, it was assumed in the discussion that this floor price would always be a stopping place in the process of reduction from a higher starting point, and the possibility that the floor as an obstruction to descent might be avoided by starting below the floor did not occur to them.

In the circumstances, the text of the statute not giving a clear answer, and there being no Congressional intent pointed at the particular problem, the best we can do is to determine, as best we can, what Congress would have intended if it had put its mind to the problem. Our conclusion is that it would have intended that ships should not be sold at less than the floor price.

When the members of Congress were discussing the financial misfortune which the Government was suffering in selling ships for approximately one third of what the Government had paid for them a year or two before, we feel reasonably sure that a member who foresaw the instant case and reminded his colleagues that perhaps in some cases the ships would be sold for even less than this one third of the cost, would have received little support from his colleagues. We think they would have made it plain that this should not happen, although by doing so they would have been, to a degree, departing from some of the policies of the Act.

Shortly after the Act was passed, situations involving the question which concerns us here began to come to light. When the House of Representatives passed the Act, it set up a special subcommittee to observe the administration and operation of the Act. See Watchdog Committee Hearings, April 5, 6, 1946, pp. 1–2. At the committee's first hearing, a chart was presented which showed the domestic war cost and floor prices of three types of vessels, including the type involved in this case, and these floor prices were higher than the unadjusted statutory sales prices which had on several occasions been reported to Congress. Id., p. 22. The subcommittee did not question the propriety of these prices. On the contrary, it approved the Commission's proposal to raise the floor price by including certain additional items in computing the domestic war cost of the vessels. Id., p. 22.

At the subcommittee's next hearing it considered the advisability of an amendment to the Act which would permit the Commission to sell these types of vessels at less than the floor price. Watchdog Committee Hearings, June 4, 1946, pp. 6–7. The committee requested and obtained the views of the Commission, which were adverse to the proposal to amend. No action was taken on the proposal.

The Government cites other actions by the Watchdog Committee and by Congress which show that both were aware that the Commission was adhering to the

**364**

floor price even when it was higher than the unadjusted statutory sales price. We think that this post-enactment legislative history is of considerable weight in showing what Congress intended, or what it would have intended, if it had, at the time of enactment of the Merchant Ship Sales Act, been aware of the problem.

Our conclusion is that the plaintiff was not overcharged for its ship. The defendant's motion for a summary judgment is granted, and the plaintiff's petition is dismissed.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.

LARAMORE, Judge, took no part in the consideration and decision of this case.