**JULIUS GOLDMAN'S EGG CITY**

v.

**The UNITED STATES.**

**No. 364–75.**

United States Court of Claims.

June 15, 1977.

Edgar H. Brenner, Washington, D. C., atty. of record, for plaintiff; James A. Dobkin, Thomas B. Wilner and Arnold & Porter, Washington, D. C., of counsel.

Marc J. Fink, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, Washington, D. C., for defendant.

Before DAVIS, Judge, SKELTON, Senior Judge, and KASHIWA, Judge.

DAVIS, Judge.

A push for summary judgment is often pressed by one party or the other as a short-cut to by-pass what looms as a long or tedious trial on the facts. But we know that such a short-cut is blocked where there are disputed issues of material fact and the case cannot be decided as a matter of law on the uncontroverted facts. This is just such a litigation. The defendant alone has moved for summary judgment; the plaintiff insists that a trial is needed. Because we find summary judgment inappropriate under the controlling standard, we must remand to the Trial Division to determine most of the contested issues. We decide only (1) a few legal questions now presented, and (2) that the factual issues are sufficiently disputed to call for fact-finding.

The case concerns a lesser-known but far-reaching federal authority. Congress has given the Secretary of Agriculture power "to control and eradicate any communicable diseases of livestock or poultry * * * which in the opinion of the Secretary constitute an emergency and threaten the livestock industry of the country," and has also authorized "the payment [by the Secretary] of claims growing out of the destruction of animals (including poultry), and of materials, affected by or exposed to any such diseases, in accordance with such regulations as the Secretary may prescribe." 21 U.S.C. § 114a. This power is spelled out in more detail in 21 U.S.C. § 134a(a) and (b), including the right to seize, quarantine, and dispose of animals which are found to have been affected with or exposed to any such dangerous or communicable disease. Section 134a(d) of Title 21 provides that (with an exception not now pertinent) "the Secretary shall compensate the owner of any animal, carcass, product, or article destroyed pursuant to the provisions of this section. Such compensation shall be based upon the fair market value as determined by the Secretary, of any such animal, carcass, product, or article at the time of the destruction thereof."

This statutory scheme was invoked in 1971–1973 to eradicate exotic Newcastle disease, a contagious sickness of poultry and other birds, which only very recently came to our shores and first appeared in southern California in 1971. Both the Federal Government and the State of California cooperated to impose quarantines and stamp out the disease, efforts which eventually necessitated the destruction of infected and exposed poultry. On March 14, 1972, the Government took over the eradication program as the State's funds allocated to the project had been exhausted. The Secretary of Agriculture, acting pursuant to the legislation described above, declared

a national emergency due to the Newcastle outbreak. With that declaration the Government assumed responsibility for control of the disease and payment of indemnities pursuant to 9 C.F.R. § 53.3(b)[1] to cover the cost of destroying infected or exposed flocks and cleaning and disinfecting premises.

Plaintiff Julius Goldman's Egg City, a California concern, is the country's largest commercial egg producer with a poultry flock in 1972 of approximately 3,000,000 birds. Between August and September 1972, the Government placed sentinel birds (whose purpose was to detect the presence of Newcastle disease on the ranch) at Egg City. After a number of these birds died, laboratory tests yielded a diagnosis of Newcastle disease. The Government notified Mr. Goldman that his flock was infected and demanded depopulation and disinfection of all buildings and equipment. This was done and plaintiff became entitled to the indemnity contemplated by the statute and the regulations. The regulations (9 C.F.R. § 53.3(a)) established an appraisal system whereby federal and state appraisers evaluated the poultry before depopulation. Under these regulations, one representative from the Department of Agriculture and one from the State of California appraised the flocks on all commercial egg producing ranches. In September 1972 they valued the Egg City chickens. The usual procedure involved counting the number of chickens on a ranch but, with a facility Egg City's size, counting served as a spot check on the numbers carried on the ranch's own books. The Government considered Egg City's records accurate and used them to determine the number and ages of the birds. The number of chickens was multiplied by monetary indemnities based on the Government's view of the then current fair-market-value-cost of obtaining replacement birds of various ages. The ap-

praisers then presented Mr. Goldman with the appraisal and requested his signature so that eradication of the flock could begin.

It is at this juncture that the present dispute between the parties began. Simply put, the Government claims that Mr. Goldman signed-off on the appraisal forms (after asking for and receiving certain increases in appraised value) and that his signature was a binding acceptance of the indemnity amount he was to receive. Plaintiff, however, claims that he clearly expressed disagreement with the completed appraisal (and particularly with the base used to make the evaluation). He says that he signed the forms only because the Government told him that his signature was necessary for commencement of depopulation and, most important, because he was assured by the appraisers that the appraisals were not final and increased indemnification could be sought. Despite Mr. Goldman's repeated requests, the Government has refused to increase plaintiff's indemnification under this phase of the program.

During the summer of 1972 the Government decided that the replacement-cost indemnity (the program's initial phase, just described) did not adequately compensate poultrymen for the egg production value of their flocks. As a result, there was instituted a supplemental indemnity program to reimburse ranchers for egg income lost during repopulation. This supplemental indemnity was designed to cover a 26-week repopulation period—an amount of time plaintiff claims was clearly inadequate if applied to its huge facility. Mr. Goldman also asserts that he consistently protested the application of the 26-week formula to his farm and that he was just as consistently given to understand that his protests would be considered by the Agriculture Department—and that they were, although always turned down. The defendant, on the contrary, insists that Mr. Goldman ac-

1.  9 C.F.R. § 53.3(b) provides:

    The appraisal of animals shall be based on the fair market value and shall be determined by the meat, egg production, dairy or breeding value of such animals. Animals may be appraised in groups providing they are the same species and type and providing that where appraisal is by the head each animal in the group is the same value per head or where appraisal is by the pound each animal in the group is the same value per pound.

cepted this supplemental indemnity as final, without cavil at the time.

After failing to obtain redress from the Department on both the initial and the supplemental indemnity, plaintiff filed this suit. Defendant seeks to guillotine the case before trial on three grounds: (a) there can be no judicial review at all of these indemnity payments; (b) in any event, the defendant's presentation shows conclusively that the program conformed to all requirements of statute and regulation; and (c) under the doctrine of accord and satisfaction, plaintiff accepted both types of indemnity and is now barred from seeking additional compensation.

### A.

■ 1. The Government's motion does present one true legal issue not calling for fact-finding—is the plaintiff's monetary claim amenable at all to judicial scrutiny? We are concerned only with the legislative provisions relating to the payment of the indemnity after poultry has been destroyed, not with an effort to prevent, by injunction or suit for declaratory relief, the carrying out of an order of eradication. On the monetary facet we hold that judicial review is available but that plaintiff cannot prevail unless it proves that the administrative computation, as applied to it, was arbitrary, capricious, an abuse of discretion, or contrary to law.

Take first the language of the statute relating to the indemnity. 21 U.S.C. § 114a, *supra*, authorizes "the payment of claims growing out of destruction of animals (including poultry) * * * affected by or exposed to any such disease * *," and 21 U.S.C. § 134a(d) directs, first, that "the Secretary *shall compensate* the owner of any animal * * * destroyed pursu-

ant to the provisions of this section," and, second, that "[s]uch compensation *shall* be based upon the fair market value as determined by the Secretary, of any such animal * * * at the time of the destruction thereof" (emphasis added). Thus, the Secretary *must* pay an indemnity if compensable animals are destroyed (*Cumberland v. Dept. of Agriculture,* 537 F.2d 959 (7th Cir. 1976)) and the general standard of payment is expressly prescribed; in a case like this, the Department does not have discretion whether or not to pay nor can it decide for itself that something other than "fair market value" shall be awarded. Also, it is important that there is no explicit provision in the statute (or the regulations) precluding further review, or making the administrative determination final, conclusive, or binding. *Cf. Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 313, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958).[2] The only textual phrase on which the defendant can hang its hat is that the measure of fair market value shall be "as determined by the Secretary." Those words, as discussed below, go to show that, to the extent a determination of "fair market value" involves a span of discretion, the court cannot substitute its own discretion for properly exercised administrative discretion. But the language does not carry the further burden of making the Secretary's exercise of his discretion conclusive even though he abuses it, acts arbitrarily or capriciously, or fails to follow the statutory standard by refusing to grant a reasonable fair market value. As often pointed out, judicial review is wholly precluded only if the administrator enjoys absolute discretion and the determination is totally committed to his judgment. On their face the words of this statute command an award based on something which can reasonably and properly be denominat-

2. In some instances of indemnity paid for destroyed corps or animals, Congress has expressly declared that the Agriculture Department's award shall be final. 21 U.S.C. § 103 (indemnity for diseased animals imported into the country); 7 U.S.C. § 150e (compensation for certain crops destroyed because of infestation). *See also* 7 U.S.C. §§ 217a, 610(e), 1385, 1785; 16 U.S.C. §§ 577g, 577g–1.

In general, explicit statutory provisions seeming to preclude judicial review are not common and even when they are used the courts have in many instances found some sort of review appropriate. *See* W. Gellhorn & C. Byse, Administrative Law 217–229 (6th ed. 1974), for a discussion of the cases in this area.

ed "fair market value," a general concept long known to the law, with ascertainable outer boundaries and not unlimited in its scope. The statute thus supplies a well-known guideline instead of leaving the Secretary wholly at large.[3]

Nor are we persuaded by any extra-textual indication that it was Congress's purpose to cut off judicial review. *See, e. g., Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Moore-McCormack Lines, Inc. v. United States,* 413 F.2d 568, 574–75, 188 Ct.Cl. 644, 655–56 (1969). Though judicial scrutiny is not mentioned in the legislative history, nothing in it states or implies that the Secretary's discretion is unlimited, exclusive or final, or that court review is excluded. Keeping the Secretary within bounds, and within the law, is fully consistent with what was said in Congress.

The defendant points out that the statute's purpose is to give the Secretary continuing authority for disease control and eradication (an authority previously derived only from annual appropriation bills), allowing him to take swift action to eliminate the inherent dangers of contagious livestock diseases. The argument is that the purpose of the indemnity is not only to compensate the owner but to engender owner cooperation with the Secretary's efforts. Defendant would have us conclude that judicial intervention would improperly replace Secretarial discretion with the court's and thereby reduce severely the Secretary's

ability to deal decisively and swiftly (as Congress obviously contemplated) with the disease problem. We can accept the Government's delineation of the legislative aim without drawing the Government's conclusion. To allow judicial oversight of the fixing of the indemnity need not interfere at all with the prompt elimination of diseased animals. Nothing requires or suggests that the final determination of the indemnity should or must precede eradication; indeed, the owners' cooperation may well be enhanced by the knowledge that, if dissatisfied with the award, they will be free to seek court review after destruction of the animals. As we have already pointed out, we have here solely a post-destruction claim for monetary relief, not an application to restrain the contemplated elimination of diseased livestock or poultry.[4]

2. Having decided that some review is permissible, we must face two additional legal problems. The first is the proper standard for that review. Shall the court decide for itself what was the "fair market value" or is the Secretarial determination to be upheld unless it is found to have been arbitrary, capricious, an abuse of discretion, or violative of the statutory standard? The answer lies in the legislative prescription that "fair market value" is to be "as determined by the Secretary." Those words call for the second standard referred to above, and preclude the court's deciding the issue of "fair market value" independently and for itself. The legislative history speaks regularly of a Secretarial determination and we see no reason to depart from the

---

**3.** Questions of fair market value are of course commonplace to the courts and especially to this court under our jurisdiction to hear taking cases, tax claims, Indian claims and patent compensation suits. We are not presented with a case in which there is no law at all to apply (*see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), nor are we involved with special problems such as those presented in cases like *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), *Panama Canal Co. v. Grace Line, Inc., supra,* and *Curran v. Laird,* 136 U.S.App.D.C. 280, 420 F.2d 122, 129 (1969), where the national defense, foreign affairs, and concomitant presidential powers were at issue.

Instead we are concerned with fair market value, a question traditionally considered and reviewed by the courts.

**4.** To conduct disease eradication programs, the Secretary, pursuant to 21 U.S.C. § 134a(c), has the authority to declare the existence of an extraordinary emergency, dispose of affected poultry, and recover from owners the costs of any care, handling or disposal incurred. This provision, under the appropriate conditions, gives the Secretary formidable authority to act swiftly and prevent further danger to public health and property even in the face of owner resistance.

normal rule that administrative determinations of this type are not to be displaced by judicial determinations made entirely *de novo*. *See, e. g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413 *ff.,* 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[5] Nothing which can be called an administrative record was made in the Agriculture Department and therefore we shall have to have a trial in this court,[6] but the ultimate standard of decision here will not be the court's own view of "fair market value" but the propriety of the Secretary's determination under that statutory criterion.

3. The other remaining question is the disposition of the case if it is ultimately decided by the court that the Secretary's determination was improper. The same statutory words and the same principles which preclude the court's determining "fair market value" for itself require that, if the administrative award is overturned, the matter be remanded to the Secretary for a proper award—unless the record made here mandates only one acceptable determination. That is comparable to the practice under the Wunderlich Act, 41 U.S.C. §§ 321–22, and it is appropriate for this case of a nonconstitutional indemnity which Congress has authorized the Secretary to grant.

## B.

■ Defendant's secondary contention is that, if there can be judicial review, the Government has conclusively shown by its presentation on summary judgment that no substantial violation occurred. We cannot accept this argument. Defendant has given

us affidavits by government officials and other materials tending to support its position but plaintiff has countered with affidavits by plaintiff's personnel and by a non-government expert (who participated in a large portion of the eradication program)[7] maintaining the conflicting position that (a) the formula for the initial indemnity was unfair and unrepresentative of fair market value for an operation of plaintiff's large size, and (b) the formula for the supplemental indemnity was likewise improper for Egg City and was in any event discriminatorily applied without rational basis for the differentiation. Triable issues of fact have been revealed by these opposing presentations. We cannot, of course, resolve such disputed issues on a motion for summary judgment, and a trial must be had (or other fact-finding process followed). Plaintiff has the burden of demonstrating the correctness of its allegations but it must be given that opportunity.

## C.

The last defense proffered in the Government's motion is that plaintiff entered into an accord and satisfaction (with the Department of Agriculture) accepting the awarded indemnity in full satisfaction of its claims. This is premised, with respect to the initial indemnity, on the fact that in September 1972 Julius Goldman signed the Government's appraisal forms without reservation or written protest.[8] As we have indicated, Mr. Goldman has submitted an affidavit swearing that (1) he had protested to the appraisers the bases used for the appraisal

---

5. Though plaintiff challenges the amount of the departmental award, it does not urge that it was entitled to any procedures other than those followed by Agriculture. Nor does the claimant contend that it is entitled to just compensation in the constitutional sense. It is certainly doubtful that such a claim could stand. *See Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (upholding the destruction, without just compensation, of cedar trees passing on a communicable plant disease).

6. We hold in Part B, *infra,* that defendant has not shown conclusively, on this summary judgment motion, that the indemnities were proper.

7. Plaintiff has also supplied some documentary materials in support of its position.

8. The statement signed by Mr. Goldman said: "I certify that I own or am authorized to represent the owner of the animals or materials identified in this claim. I make claim for all amounts due me in accordance with all applicable laws and regulations governing the payment of indemnities for the animals or materials identified and to be destroyed because of the disease specified. I further agree to slaughter of said animals and accept the appraisal value for each."

of Egg City's flocks, (2) the appraisers answered that they had no authority to change the bases even if Goldman were correct, (3) the appraisers also "told me not to worry about signing the appraisal forms. They explained that the forms had to be signed to get work under way, but that the appraisals were not final. They explained that this was an emergency program and that speed was essential. They said they couldn't wait to negotiate the correct value of the birds at that point, but that the appraisal guidelines were being reconsidered and would be changed, and I would have the right to seek increased indemnification later. They also told me that discussions were under way to pay indemnification for lost income for the time I would be out of business. Based on these representations and on my trust in the Government, I signed the forms to authorize them to destroy the poultry."[9]

As for the supplemental indemnity, Goldman signed the same type of statement. His affidavit sets forth this version of the sequence of events: In February 1973, after repopulation had begun at Egg City, he visited Dr. Sharman, the official then in charge of Newcastle eradication. When Goldman informed Sharman that more than 26 weeks (the Government's base for calculating the supplemental indemnity) would be needed for Egg City's repopulation, the latter told him to make a written request for an extension. Plaintiff thereupon wrote to Dr. Sharman requesting both an extension of the supplemental indemnity period and an increase in initial indemnity payments. A month later plaintiff received a reply (from another Government official) denying its requests and stating that the indemnification procedures had to be applied uniformly to all ranchers. Mr. Goldman again contacted Dr. Sharman and asserts that he was reassured that plaintiff's requests were still under consideration. On March 30, 1973, plaintiff again approached Dr. Sharman about the supplemental in-

demnity and stated that it needed those additional funds to repopulate the ranch. Mr. Goldman avers that Dr. Sharman said that the funds could only be released if Goldman signed the appropriate forms but that the signed forms would not bar further requests for increased indemnification. Mr. Goldman signed and continued to press his claims, meeting with Government officials who allegedly assured him that his application for more funds was still under consideration. Finally, on July 19, 1973, a Dr. Saulmon told plaintiff (repeating the Government's earlier rationale) that the claims had to be denied because the indemnification formulas applied uniformly to all depopulated ranches. Goldman, however, continued to pursue his claims. Through government records obtained under the Freedom of Information Act, he discovered that other nearby ranches had been given a repopulation period of more than 26 weeks, extensions based on the time required to depopulate, clean and disinfect Egg City. Armed with this information, Mr. Goldman wrote to Agriculture Secretary Butz, accusing the Department of inequitable treatment toward Egg City. A meeting with Assistant Secretary of Agriculture Feltner was arranged to review Goldman's claims for more money and two months later, on September 29, 1975, Feltner denied plaintiff's requests.

On the basis of these averments in Mr. Goldman's affidavit, plaintiff urges that, for neither the initial nor the supplemental indemnity, was there an accord and satisfaction because the Government (a) assured Egg City that signing the forms would not bar it from pursuing its claims, (b) actually considered plaintiff's claims on their merits well after the forms were signed, and (c) was aware that plaintiff did not intend to relinquish its claims by signing the appraisal forms.

We think that, here too, triable issues of fact—relevant issues of fact—have definite-

9. Mr. Goldman also said in his affidavit that "I made clear to them [the appraisers] that I did not agree to the values assigned to the birds in those forms, and that I would continue after

signing those forms to claim increased indemnification to reflect the true value of the birds. They [the appraisers] understood that."

ly been raised by Goldman's affidavit. If plaintiff is proven correct in its factual predicates, there will have been no accord and satisfaction. This court has said that even a general release will not prevail "where the conduct of the parties in continuing to consider a claim after the execution of the release makes plain that they never construed the release as constituting an abandonment of the claim" (*J. G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 807 (1963)), and that claims included in a release are gone "unless by its conduct the Government indicates a willingness to entertain them regardless of the release." *Adler Constr. Co. v. United States*, 423 F.2d 1362, 1365, 191 Ct.Cl. 607, 613 (1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971). In *Inland Trucking Corp. v. United States*, 281 F.2d 457, 460, 150 Ct.Cl. 642, 647 (1960), the court ruled that signature of a form referring to "complete and final settlement of the contractor's claim" did not bar recovery where "plaintiff in fact did protest the deductions [orally]" and "did not intend to waive its protest or abandon its claim when it accepted final payment and the defendant's representatives so understood." *See, also, Northern Helex Co. v. United States*, 455 F.2d 546, 555, 197 Ct.Cl. 118, 132–33 (1972). Consideration of such oral assurances by defendant's representatives would not be precluded by the parol evidence rule since plaintiff's proof would (if credited) show that the unclear and less-than-explicit appraisal forms were not meant as fully integrated and self-contained instruments, and therefore that Goldman's agreement to "accept the appraisal value" for each type of poultry was not intended to preclude additional monetary claims. *See* Restatement (Second) of Contracts § 240 (Tent. Draft No. 6, 1971); *Nippon Hodo Co. v. United States*, 160 F.Supp. 501, 502, 142 Ct.Cl. 1, 4 (1958); *L. W. Packard & Co. v. United States*, 66 Ct.Cl. 184, 192 (1928); *Murray v. Lichtman*, 119 U.S.App.D.C. 250, 339 F.2d 749, 751 (1964).

We add one caveat. To be taken into account the oral assurances by federal personnel on which plaintiff relies must not have been beyond the authority of those who spoke them. *See Richards & Associates v. United States*, 177 Ct.Cl. 1037, 1051 (1966). But this authority need not be express; it may be implied from the scope of the work delegated to the official or employee, as well as the level and nature of his activities. *See, e. g., Centre Mfg. Co. v. United States*, 392 F.2d 229, 236, 183 Ct.Cl. 115, 127–28 (1968) (plurality opinion).

In addition to its factual arguments, plaintiff asks us to pretermit any inquiry into the circumstances in which it signed the appraisal forms by following a number of the court's decisions in which a claimant was allowed to recover under a statute even though he had some sort of consensual arrangement with the Government which seemed to provide for less than the statute called for.[10] However, we do not accept this invitation to decide at this time that in no foreseeable circumstances would plaintiff be precluded from showing that it failed to receive statutory "fair market value." That issue will not arise if plaintiff succeeds in its factual contentions as to the signing of the forms.[11] But even if Egg City does not prevail on those points, the particular facts found by the Trial Division may well have a significant bearing on Egg City's entitlement to any further recovery which can be shown under the statute—for example, whether plaintiff should be held to have waived its statutory rights under conditions which make that waiver binding

**10.** Plaintiff cites: *American Export Isbrandtsen Lines, Inc. v. United States*, 499 F.2d 552, 578, 204 Ct.Cl. 424, 468 (1974); *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 167 Ct.Cl. 236 (1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965); *American President Lines, Ltd. v. United States*, 291 F.2d 931, 936, 154 Ct.Cl. 695, 705 (1961); *Suwannee S. S. Co. v. United States*, 279 F.2d 874, 150 Ct.Cl. 331 (1960); *Southeast-*

*ern Oil Florida, Inc. v. United States*, 119 F.Supp. 731, 127 Ct.Cl. 409 (1953), *cert. denied*, 348 U.S. 834, 75 S.Ct. 56, 99 L.Ed. 658 (1954); *A. H. Bull S. S. Co. v. United States*, 108 F.Supp. 95, 123 Ct.Cl. 520 (1952).

**11.** Nor will the issue be important if the defendant prevails on the merits of the claim.

on it. We leave this matter to the trial judge to consider, if it becomes necessary, in the light of all the facts he finds.

For these reasons, we deny the defendant's motion for summary judgment and remand the case to the Trial Division for further proceedings consistent with this opinion.