**L. W. DOUGLAS, Jr., et al.**

v.

**The UNITED STATES.**

No. 165–77.

United States Court of Claims.

May 17, 1978.

Jacqueline R. Denning, Washington, D. C., for plaintiff; James A. Dobkin, attorney of record, Arnold & Porter, Washington, D. C., of counsel.

Jean Schepers, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before DAVIS, KUNZIG, and BENNETT, Judges.

## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

KUNZIG, Judge:

This action, involving the statutory interpretation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act,[1] pursuant to which plaintiffs claim reimbursement for certain penalty costs incurred as a result of their sale of real property to the United States Postal Service (USPS) is before the court, which assumes jurisdiction pursuant to 28 U.S.C. § 1491 (1970), on the parties' cross-motions for summary judgment. Although defendant asserts that Congress did not envision coverage by the statute in question of commercial sellers of real estate engaged, as were plaintiffs, in three-party financing arrangements, we find that plaintiffs incurred a "penalty cost" because of the "prepayment" of a "pre-existing recorded mortgage" within the meaning of the statute and are, therefore, entitled to reimbursement.

Plaintiffs are general partners in D–E Office Buildings (D–E), an Illinois limited partnership engaged in the development of a major office building complex in San Bruno, California, a South Bay suburb of San Francisco. The financial arrangements finally settled upon by D–E and its lenders were apparently consistent with those usual and customary for this type of project.[2] D–E first had to obtain a permanent loan commitment from Aetna Life Insurance Company (Aetna). This commitment from Aetna to finance $4,950,000 over 30 years enabled D–E to secure short-term, construction loan financing from a local California

---

1. The statute in question here reads, in pertinent part:

    The head of a Federal agency, as soon as practicable after the date of payment of the purchase price or the date of deposit in court of funds to satisfy the award of compensation in a condemnation proceeding to acquire real property, whichever is the earlier, shall reimburse the owner, to the extent the head of such agency deems fair and reasonable, for expenses he necessarily incurred for—

    \*　　\*　　\*　　\*　　\*　　\*

    (2) penalty costs for prepayment of any preexisting recorded mortgage entered into in good faith encumbering such . . . property . . . .

    \*　　\*　　\*　　\*　　\*　　\*

    Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, § 303, 42 U.S.C. § 4653 (1970).

2. See, e. g., Haggerty, *Procedures, Forms and Safeguards in Construction Lending with a Permanent Takeout*, 85 Banking L.J. 1035 (1968).

bank, Union Bank (Union). An agreement among D–E, Aetna, and Union provided that Union would provide interim financing on the project only during the construction of the building and that Aetna would then purchase the loan from Union at a time certain.

The terms of Aetna's permanent loan commitment [3] required D–E to deposit with Aetna a letter of credit for $99,000 as security on D–E's obligation to borrow the principal sum from Aetna. This sum was termed, by Aetna, a "standby fee." The commitment obligated Aetna to fund the principal loan amount by purchasing the mortgage loan, not later than June 30, 1973, from Union Bank,[4] but provided that if the permanent loan was not funded by Aetna, D–E would forfeit the $99,000 "standby fee." Otherwise, the fee would be fully refundable.

Once Aetna's permanent loan commitment was assured, D–E was able to obtain an interim construction loan from Union, the terms of which *required* D–E to comply with all of the conditions of the Aetna commitment.

The document which really formalized the obligations of D–E, Aetna and Union in this complex three-party financing arrangement was the "Buy-And-Sell" Agreement (BSA) executed on June 26, 1972. The BSA obligated Aetna to purchase Union's loan and to utilize as security the same mortgage (on the property being developed) which Union had recorded. Thus, under the BSA (which was never recorded), Aetna would succeed Union as mortgagee on the recorded mortgage and as holder of the promissory note.[5]

One further provision of the BSA precluded prepayment of the note prior to the closing of Aetna's permanent loan and prohibited Union from "releas[ing] any part of the security for its loan, accept[ing] payment or prepayment thereof, accelerat[ing] the maturity, [or] assign[ing] or transfer[ing] the loan" except to Aetna.

In July 1972,[6] the USPS arrived on the scene. The USPS had apparently been approached by D–E's leasing agent regarding the possible purchase of another building in the general area of San Bruno. The USPS, after inspecting several sites, expressed an interest in purchasing the building which D–E was constructing and in which D–E had intended to lease space. Although the extent of the "negotiations" between the parties is unclear, it is evident that they finally arrived at an acceptable sales price and that D–E transferred the property to USPS.[7]

---

**3.** The terms of Aetna's permanent loan commitment were detailed on several documents which, together, made up the "commitment": (1) D–E's mortgage loan application for $4,950,000 at 9¼% interest repayable over 30 years; (2) Aetna's letter to D–E of November 16, 1971; (3) Aetna's letter to D–E of December 16, 1971; (4) Aetna's letter to Coldwell Banker (D–E's leasing agent) of March 15, 1972; (5) Aetna's letter to Coldwell Banker of May 9, 1972, and (6) Aetna's letter to D–E of July 12, 1972. None of these documents was recorded.

**4.** Aetna's obligation was conditioned on D–E's constructing a building and parking structure on the land not later than the June 30, 1973 "take out" date.

**5.** The promissory note, although never recorded, was, according to defendant, incorporated by reference in the recorded mortgage instrument (Deed of Trust). The note provided for payments to Union only from August 1, 1972 to June 1, 1973, at which time all principal and interest was due. The note further provided however, a 30-year repayment schedule, with prepayment privileges and penalty, which was to become effective if (and when, under the terms of the BSA) Aetna, the permanent lender, purchased the note.

**6.** D–E, Aetna and Union were all in full compliance with the terms of the BSA, and the project was *progressing satisfactorily toward the* planned "take out" by Aetna.

**7.** The purchase price agreed upon by the parties was $5,781,000. This sum was allocated as $925,000 for the land and $4,856,000 for "improvements." The parties here agree that this amount represented the fair market value of the real estate purchased and that no amount was included in the purchase price to defray additional costs such as the one now claimed by plaintiffs in this action.

Pursuant to the D–E/USPS [8] Agreement of Sale, D–E was required to remove all encumbrances on the property to be sold. In order to do this, D–E was compelled to prepay the note (secured by the recorded mortgage) to Union, and both D–E and Union were compelled to seek release from the terms of the BSA from Aetna. This release was granted in a letter from Aetna to Union dated March 1, 1973. Aetna, however, elected to retain $75,000 of D–E's $99,000 standby fee, to which it was entitled under the terms of the permanent loan commitment.[9]

At the closing of the sale of the real estate to USPS, D–E informed the Government representatives of the additional cost incurred in terminating its original financing arrangements and stated their possible intention to claim reimbursement for this additional cost under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.[10] The Government representatives, according to their affidavits now before the court, made it clear to D–E, both at the closing and thereafter, that, in their opinions, D–E was not entitled to such reimbursement and that they (the Government representatives) would oppose any such payment.

D–E nonetheless filed, on January 31, 1974, an Application for Relocation Payments and Reimbursement of Expenses Pursuant to Public Law 91–646. This application, filed with the USPS, was denied by the Acting Manager of the Real Estate Division on July 9, 1974, with the statement:

The evidence presented to us fails to indicate that the Aetna loan commitment was secured by a recorded mortgage on the property conveyed to the Postal Service.

D–E appealed this denial to the Director, Real Estate, USPS, on December 3, 1974, and thereafter complied with all requests for information which the USPS requested. For nearly two and one-half years, D–E awaited a decision and allegedly received "innumerable assurances" from the USPS that such a decision would be forthcoming. Finally, on March 25, 1977, D–E filed suit for reimbursement in this court. Then, on May 6, 1977, the USPS denied D–E's appeal, stating that "the payment for which you seek reimbursement was not made to the lender."

Plaintiffs now argue before this court that Section 303 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the Act)[11], on its face, entitles them to reimbursement of the $75,000 cost incurred in conveying title to the defendant because the cost clearly was a "penalty cost" for "prepayment of [a] preexisting recorded mortgage entered into in good faith encumbering such real property." Citing cases interpreting "prepayment penalty" in analogous contexts [12], plaintiffs argue that, because of the highly integrated nature of modern three-party financing, its $75,000 payment comes within the judicially established boundaries already in existence.

Plaintiffs further contend that, even though the clear language of the statute and its existing judicial interpretations necessitate no resort to the legislative histo-

---

**8.** The contract with D–E was actually entered into by the United States Army Corps of Engineers, Sacramento District, "acting for and on behalf of the United States Postal Service."

**9.** This decision by Aetna to "retain $75,000 out of the $99,000 standby fee we hold" as the price of "terminating our commitment" is evidenced by an Aetna internal communication dated February 28, 1973, one day before Aetna's formal release was sent to Union.

**10.** D–E went so far as to insist on the inclusion, in the Agreement of Sale, of Paragraph 4.7 which states:

Seller acknowledges that it is aware of its right to claim reimbursement for costs incurred in conveying title to the Government in accordance with PL 91–646.

**11.** See note 1, supra.

**12.** The parties agree, and our research confirms, that "penalty costs for prepayment," in

ry [13], the legislative history affirms D–E's entitlement to the reimbursement. They note that the courts have previously recognized the intent of Congress, in passing the Act, "to bring about uniform nationwide procedures for the taking of property by the federal government . . . ,[14]" and conclude that an interpretation of the Act that would preclude recovery for a penalty cost inherent in the now-common three-party financing, but would allow recovery in two-party financing arrangements, certainly would not foster uniformity.

Finally, plaintiffs assert that the USPS should be equitably "estopped" to change its rationale for denying D–E's claim on the ground that the change of position in the two and one-half year delay between USPS' original denial and its denial of D–E's appeal, represents the type of *post hoc* rationalization of agency action condemned by the Supreme Court in *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

Defendant, on the other hand, relies heavily upon two different facts to demonstrate that plaintiffs' claim does not fall within the actual wording of the Act. Of prime importance, argues defendant, is the fact that the $99,000 fee was not a "prepayment penalty." The Government notes that the D–E/Aetna agreement characterized the sum as a "standby fee," to be forfeited if the permanent loan did not close, and that the same agreement provided for an entirely separate "prepayment penalty," which would become payable only after the Aetna loan closed. Thus, reasons the Government, since the Aetna loan never closed, the sum lost by D–E was the "standby fee" and not the "prepayment penalty."

The defendant further asserts that, since only the mortgage instrument to Union was formally recorded, any payment to Aetna could not have been for or on account of a "preexisting recorded mortgage" as required by the Act. It concludes that an interpretation which requires the Government to pay hidden or secret fees would place an intolerable burden on its land procurement operations.

The Government then moves on to its legislative intent point and characterizes D–E's claim for reimbursement as an "attempt to increase the purchase price which D–E agreed to accept for the Building," and states that this court's allowing such an attempt to succeed would directly contravene both the expressed legislative intent and the interpretation previously given the Act by other courts [15].

Defendant's final contention centers on justifying the apparent change of position of the USPS in denying D–E's appeal; the use of one reason in denying D–E's initial claim, does not, argues the Government, concede all other issues to D–E. The Government also urges that this court, if we decide that plaintiffs are entitled to reimbursement, must now remand the action to the same agency which just took two and one-half years to rule on the appeal, for a determination of what amount would be "fair and reasonable."

Because we believe that the Government's interpretation of the Act is far too narrow and that acceptance of the Government's position would contravene the expressed intent of Congress in passing the Act, and because we find that remand to the agency is unnecessary under the facts in the present case, we hold that the plaintiffs are entitled to recover the $75,000 in issue as a "penalty [cost] for prepayment of [a] pre-existing recorded mortgage."

The question now before us basically requires that we decide whether either the wording of the Act or the expressed intent

the context of 42 U.S.C. § 4653, has not heretofore been subject to judicial interpretation.

**13.** *Citing Ex Parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949).

**14.** *Citing Whitman v. State Highway Commission*, 400 F.Supp. 1050, 1056 (W.D.Mo.1975).

**15.** *Citing Will-Tex Plastic Mfg., Inc. v. Dept. of Housing and Urban Development*, 346 F.Supp. 654, 659–60 (E.D.Pa.1972), aff'd., 478 F.2d 1399 (3d Cir. 1973).

of Congress necessitates a distinction between the more traditional, two-party financing arrangements which Congress undoubtedly had in mind in the course of its deliberations (and which the Government conceded at oral argument would be covered by the Act, even in a commercial setting) and the more modern and more complex three-party financing arrangements now in vogue in high-cost commercial real estate development.

Had D–E gone directly to Aetna to finance the entire project (i. e. had both the construction and permanent loans been combined into one) and had Aetna been the original mortgagee, there is little question that a sum charged by Aetna to allow D–E to clear its title would have been reimbursable as directly within the statutory language "penalty costs for prepayment of any preexisting recorded mortgage entered into in good faith encumbering such property."

Such a conclusion is supported by Judge (now Justice) Stevens in the case of *Goldman v. First Federal Sav. & Loan Ass'n*, 518 F.2d 1247 (7th Cir. 1975). In that case, the loan agreement made no provision for a "prepayment penalty" and federal regulation prohibited the lender from charging such a penalty unless there was some such specific provision. The borrower in *Goldman* paid off his loan in advance, but the lender retained some $36.25 in prepaid interest covering a period for which (because of borrower's prepayment of the principal) there was no principal outstanding on the loan. The court there was faced with the problem of determining whether such a "retention" constituted a "prepayment penalty" prohibited by the regulation. In reaching its decision [16], the court enunciated two standards which are highly relevant and useful to our present determination:

> Nor do we believe the fact that a prepaid amount is *retained* by the lender, as opposed to the exaction of an additional charge, is of consequence. For surely if a borrower . . . had to forfeit

amounts deposited . . . he would incur a prepayment penalty.

\* \* \* \* \* \*

The proper test, it seems to us, is whether there is a charge imposed at the time of prepayment that would not be imposed if the note were paid at maturity instead of at an earlier date. Moreover, the nature of any such charge, rather than [the] amount, should be determinative. (emphasis in original.) 518 F.2d at 1251–52.

It is also significant that the Seventh Circuit apparently considered irrelevant the fact that the parties themselves had not termed the sum retained as a "prepayment penalty." Thus, as should be the case, the court, and not the parties, decided the legal effect of the facts in issue.

Accepting the test developed by Judge Stevens as a reasonable common sense approach to the "prepayment penalty" question, and applying that test, by analogy, to the case at hand, it appears, under the terms of Aetna's loan commitment, the $75,000 retained by Aetna would clearly *not* have been retained had D–E paid off its loan at maturity, which it assumably would have done absent the intervention of the USPS. We do not find controlling the mere fact that the parties to the permanent loan commitment separated the possible penalties which could be assessed for early payment of the $4,950,000 principal in question into "standby" and "prepayment" categories. Any such distinction, for purposes of the "penalty costs" language of the Act, would simply not be in accord with the reality of the situation.

Turning our attention now to the requirement of the Act that the sum which we have determined to be a penalty cost must be incurred in prepayment of a "preexisting recorded mortgage," we find no disagreement from the Government that there was, in fact, a "preexisting recorded mortgage" on the property in question. The Government's argument, therefore, clearly hinges

---

16. The court, applying the tests set forth, *infra*, determined that there was no "prepayment penalty" because the borrower would have faced the same "additional charge" had he paid off his loan at maturity.

on the fact that Union, and not Aetna, was the *named mortgagee* in the recorded mortgage document. It is just this attempted distinction between the immediate and the ultimate mortgagee which raises the question of whether the wording of the statute places, or should place, borrowers in a two-party financing arrangement in a preferred position vis-a-vis borrowers in a three-party financing situation.

At oral argument, the defendant's only response to questions of this nature centered on the contention that Congress clearly didn't have in mind the commercial land developer, the primary user of three-party financing, when it passed the Act, but was, instead, concerned with the displaced homeowner, who nearly always has only a single mortgagee. Such a response, however, misses the mark since a commercial developer who utilized only one lender and thus had only one mortgagee, would be covered to the same extent as the proverbial "poor, displaced homeowner" constantly referred to by the Government.

■ The purpose of the statutory language requiring a "preexisting recorded mortgage" particularly when read in conjunction with the "good faith" requirement which follows[17], appears to have the twofold purpose of preventing collusion between a seller and a prospective mortgagee and of allowing the Government to discover pertinent financing arrangements (and related costs) prior to closing a purchase. Neither of these purposes will be circumvented by construing the statute in a fashion which will cover three-party financing situations like the one in issue here.

■ The requirement of a "preexisting recorded mortgage" is met by the mortgage to Union, which was both "preexisting" and "recorded." Such mortgage was sufficient both to establish the fact that financing existed prior to the Government purchase and to put the Government on notice that there was a financing arrangement. The promissory note was incorporated by reference in the recorded mortgage instrument, and a thirty-year repayment schedule to Aetna was specified in the note. The requirement that Aetna had to release D–E and Union in any prepayment situation and the coincident requirement that D–E forfeit the $99,000 were formalized and contained in easily discoverable documents, the BSA and the Aetna loan commitment. The "three-party" aspect of the financing arrangement was not hidden from the Government[18]. Far from placing an "intolerable burden" on the Government to discover "hidden" financing arrangements, our extension of the "preexisting recorded mortgage" language to cover a preexisting planned successor mortgagee of which the Government had notice merely requires the Government to discover what any prudent business person would want to know. In such a situation, entry by the Government into a major real estate transaction with less than full knowledge of then-existing financing arrangements would certainly be less than prudent[19].

Having thus determined that the payment made by D–E to Aetna falls within the statutory language "penalty costs for prepayment of any preexisting recorded mortgage . . . ," we note in passing that, far from hindering the congressional purpose as claimed by the defendant, such an interpretation will plainly foster the achievement of declared congressional goals.

While much of the discussion in Congress, as would be expected, appears to have centered on the Relocation Assistance portion of Public Law 91–646, there are several statements of general purpose which apply

---

17. Defendant has raised no question in this case that D–E, Union and Aetna were all operating in good faith at all times material to the case at hand.

18. Indeed, the Government admits full knowledge of the three-party financing arrangements.

19. Certainly the Government could, either by regulation or by provision in the contract, require the seller to disclose, as a precondition to reimbursement, any associated "penalty costs" which seller intended to claim.

with equal relevance to the Real Property Acquisition Policies portion of the Act[20]. The Act was the

> . . . culmination of lengthy and extensive efforts to develop legislation establishing a *uniform* policy for the fair and equitable treatment of persons who . . . have their real property taken for Federal . . . programs. . . [and]
>
> \*     \*     \*     \*     \*     \*
>
> It *establishes a uniform policy on real property acquisition practice* for all Federal and federally assisted programs. . . . [however]
>
> \*     \*     \*     \*     \*     \*
>
> The Congress . . . can only provide [the] tools. Their effective use depends upon the attitudes and skill of the officials . . . of the Government responsible for their administration.[21]

(emphasis added.)

Beyond these general statements of policy, however, Congress has neatly set out its specific goals for Title III of the Act, which covers the Uniform Real Property Acquisition Policy.

> This section establishes a uniform policy for the acquisition of real property in order to encourage and expedite acquisition by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners . . . , and to promote public confidence in Federal land acquisition practices[22].

These clear statements of both general and specific congressional intent appear to be well served by our foregoing interpretation of the plain statutory language. The overriding goal of *uniformity* obviously would not be fostered by the Government's overly-technical reading of the Act. Were

we to adopt the defendant's position, owners would be treated differently, with a resultant loss of uniformity, based, not on any rational distinction, but merely on the type of financing arrangement they chose. The commercial-residential distinction urged by the Government at oral argument fares no better upon close scrutiny. Not only would the commercial owner with two-party financing be eligible to recover his penalty costs (and the residential owner with three-party financing, if such exists, be ineligible), but no provision exists for the elderly couple who rent 50% of their home for commercial gain. Would they be "residential," or "commercial," or "half-and-half"?

The difficulties with the Government's position do not end here. Since much of the major commercial development today is done with three-party financing arrangements, the Government's refusal to pay the honestly assumed, financially significant, and very real "prepayment penalties" of the type now in issue would hardly "encourage and expedite acquisition by agreements with owners." In fact, the owner faced with such significant, non-recoverable fees could very well refuse to sell and force condemnation proceedings—the very litigation and lengthy court proceedings Congress sought to avoid. Finally, it is not difficult to imagine the loss in public confidence caused by such proceedings.

For all of the above reasons, it appears that our interpretation of the statutory language is, by far, the better calculated to achieve the expressed congressional purposes.

In its final fusillade, the Government argues that, even if we decide that plaintiffs were entitled to reimbursement, this action would have to be remanded to the USPS for its determination of whether $75,000

---

**20.** It should be noted that the House Report on P.L. 91–646, in its section-by-section explanation of the Act, specifically designates the acquisition programs of the USPS as being one of the prime factors necessitating such legislation. H.R.Rep. No. 91–1656, 91st Cong., 2d Sess.,

*reprinted in* [1970] U.S.Code Cong. & Admin. News p. 5854.

**21.** *Id.* at 5850–52.

**22.** *Id.* at 5871.

was a "fair and reasonable" penalty cost [23]. In support of this proposition, defendant cites a recent opinion of this court in *Julius Goldman's Egg City v. United States,* 556 F.2d 1096, 214 Ct.Cl. 345 (1977), in which we cited the necessity of remanding an action to the Department of Agriculture for a determination of "fair market value."

Despite some facial similarity between the *Egg City* case and the case now at hand, and despite the fact that *Egg City* follows a readily acceptable procedure in cases where a significant record remains to be made [24] and agency expertise is required by statute, we find that the language of the *Egg City* case is not controlling on us here for a combination of reasons.

The first, and most important, distinction is stated in the very text of the *Egg City* opinion itself. It states that the matter must be

. . . remanded to the Secretary [of Agriculture] for a proper award—*unless the record . . . mandates only one acceptable determination.* (emphasis added.) 556 F.2d at 1101, 214 Ct.Cl. at 354.

In *Egg City,* the Secretary was required to make a determination of the "fair market value" of over three million chickens. Clearly, the determination of such a scrambled issue would require the compilation of mountainous facts and figures, plus a large element of "educated guess" which this court felt only the Secretary, with his administrative expertise, could make.

In the instant case, however, the only judgment required is to determine whether a $75,000 "prepayment penalty" is "fair and reasonable" under the circumstances of the present facts. This is no nebulous "determination." The higher amount, $99,000, was agreed upon by D–E and Aetna, two private parties in arm's-length negotiations, as representing a fair prepayment penalty (should D–E pay off the Union Loan prior to closing Aetna's) before the Government, through the USPS, ever arrived on the scene. A certain discount (to $75,000) was allowed apparently because the USPS purchased the property well before the scheduled Aetna closing and Aetna was not forced to "stand-by" with its ready capital as long as it could have been. The Government has raised no issue of collusion or bad faith on the part of any of the private parties [25]. Thus, the $99,000 must be regarded as what the market would bear under the circumstances and the only conclusion that can be drawn is that the $75,000 finally charged D–E, and then the defendant, is a "fair and reasonable" penalty cost under the circumstances [26].

▉ Further compelling us to decide this matter now and put an end to this litigation is the three-year delay which plaintiffs have already suffered. Especially in a situation such as this one, where the final result is clear, it is a longstanding rule that a court

---

**23.** The Government now claims that, although the USPS had this action before it for more than three years, it was concerned only with the "entitlement" of D-E, and thus never reached the question of whether the amount was "fair and reasonable."

**24.** This remand procedure has hardened to a rule in "Wunderlich" cases where the amount of damages remains in issue and the Board of Contract Appeals, because of an earlier holding of no liability (subsequently reversed by this court), has made *no record whatsoever* on which this court could base a finding of amount of damages. *See, e.g., United States v. Anthony Grace & Sons,* 384 U.S. 424, 86 S.Ct. 234, 15 L.Ed.2d 154 (1965).

**25.** The Government does note that it was not asked to take part in the "negotiations" which reduced the penalty from $99,000 to $75,000,

but makes no sound arguments as to why it should have been included in what was essentially, the negotiation of a release from a private financing arrangement. Ironically, an internal memorandum from Aetna, contained in the record, indicates that the reduction itself was not "negotiated," but was merely a "grace" allowed by Aetna.

**26.** This court has previously exercised its judgment in not remanding a case where the record demonstrates the legal possibility of only one conclusion. *See, e.g., Sherwin v. United States,* 436 F.2d 992, 1002, 193 Ct.Cl. 962, 979 (1971); *Maxwell Dynamometer Co. v. United States,* 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967).

may cut short an administrative process where interminable and unexplained delays have already rendered plaintiffs' rights in the administrative process nugatory. *See, e.g., Smith v. Illinois Bell Telephone Co.,* 270 U.S. 587, 592, 46 S.Ct. 408, 70 L.Ed. 747 (1926); *Walker v. Southern R.R. Co.,* 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966).

For all of the above stated reasons, we hold that the plaintiffs' $75,000 payment to Aetna was a "penalty [cost] for prepayment of [a] preexisting recorded mortgage" within the contemplation of the Act and that plaintiffs are entitled to reimbursement of that amount.

Upon consideration of the submissions of the parties, including defendant's supplemental submission, and after oral argument, plaintiffs' motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, and judgment is entered for plaintiffs in the amount of $75,000.

BENNETT, Judge, concurring:

Judge Kunzig has ably demonstrated that the $75,000 which plaintiff forfeited to Aetna was, in the terms of 42 U.S.C. § 4653(2) (1970), an expense necessarily incurred as a penalty cost for prepayment of a pre-existing recorded mortgage entered into in good faith encumbering real property sold to the United States. The statute requires that the head of the purchasing agency, "as soon as practicable after the date of payment of the purchase price," reimburse the seller for such expenses "to the extent the head of such agency deems fair and reasonable." I construe this language to require a determination of the extent to which *reimbursement* is fair and reasonable, not merely of the extent to which the penalty cost incurred by plaintiff was fair and reasonable. Not having been presented with a case requiring us to do so, we need not rule that reimbursement of penalty costs, in addition to the negotiated purchase price, will invariably be required once the penalty costs themselves are found reasonable. Of course, here the agency head, by refusing to recognize the expense as a penalty cost,

avoided decision on the extent to which reimbursement would be fair and reasonable. Although the statute appears to confer some discretion upon the agency head in making such determination, I agree with the court that, in the circumstances of this case, and there being no allegation even of bad faith or collusion in arriving at the figure, it would be an abuse of discretion for him to order the reimbursement of any amount less than $75,000. Since the record mandates only one acceptable determination, remand to the agency is not necessary. *See Julius Goldman's Egg City v. United States,* 556 F.2d 1096, 1100–01, 214 Ct.Cl. 345, 354 (1977).